UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| ROBERT HUDSON IMHOFF, IV,<br><br>Plaintiff,<br><br>v.<br><br>THE CITADEL, THE MILITARY COLLEGE OF SOUTH CAROLINA; LIEUTENANT GENERAL JOHN ROSA; LIEUTENANT COLONEL ROBERT SBERNA; CAPTAIN JOHN RYAN; MAJOR JON CRAIG; CAPTAIN LEWIS JACKSON<br><br>Defendants. | ) | Civil Action No.: 2:16-cv-2870-RMG<br><br>**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |

AND NOW COME Defendants The Citadel, The Military College of South Carolina ("The Citadel"), Lieutenant General John W. Rosa and Lieutenant Colonel Robert Sberna, by and through their undersigned attorneys, and file this Memorandum In Opposition To Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction:

## INTRODUCTION

In February, 2016, Plaintiff and a fellow cadet ("Cadet A.M.") were charged with misconduct relating to their dealings with certain “knobs” (*i.e.,* "fourth class" or freshman cadets) under their supervision. At the time of the offenses, Plaintiff was a second-class cadet, while Cadet A.M. was third-class. Plaintiff was charged with hazing, a major Class I offense, while A.M. was charged with a Major Violation of the 4th Class System. Plaintiff was ultimately found to have committed the charged offense — he admitted the offense, but was accorded a hearing anyway — and dismissed from The Citadel for one year.

Plaintiff filed the instant lawsuit, only days before cadets are to report back to The Citadel, complaining that The Citadel violated his constitutional and contractual rights. In the instant Motion, Plaintiff seeks a preliminary injunction requiring The Citadel to allow him to continue his education at The Citadel, notwithstanding his dismissal, during the pendency of this

lawsuit. The Citadel strenuously opposes this motion. To overrule The Citadel's decision in a serious disciplinary matter, which was thoughtfully arrived at with full due process, would undermine a disciplinary system that is integral to The Citadel's academic mission. The Citadel's mission is "to educate and develop our students to become principled leaders in all walks of life by instilling the core values of The Citadel in a disciplined and intellectually challenging environment." The Citadel's cadet rules of conduct and its disciplinary process are integral parts of The Citadel's educational program. The rules of conduct are exacting, discipline is strict, and punishment can be severe. Plaintiff committed the offense of hazing, which is one of the most serious disciplinary offenses in The Citadel's rules. Hazing is an abuse of the power that upper class cadets have over their subordinate cadets and is inimical to the proper operation of the Fourth Class System. Hazing is punishable by a range of sanctions, up to expulsion. The Citadel's cadet disciplinary system accords accused students much more process than is constitutionally due, because this process is itself part of the students' holistic education. Plaintiff was accorded the full due process that The Citadel's rules provide. For the reasons that follow, this Court should deny Plaintiff's Motion.

**A. <u>The Citadel's Relevant Policies</u>**

**1. <u>Hazing</u>**

The Citadel has stringent, proactive policies prohibiting hazing and subjecting cadets who haze to severe punishment, up to and including expulsion. In fact, hazing is defined and prohibited on the very first page of the Blue Book Regulations governing cadets:

> 1.5.1 **Hazing is behavior which is inconsistent with The Citadel Core Values and dangerous to the well-being of others.**
>
> 1.5.2 Hazing is prohibited. Hazing is a violation of South Carolina Law and Citadel Regulations and is punishable by up to expulsion from The Citadel. Allowing any hazing to occur, condoning acts of hazing, or failure to immediately stop an incident of hazing is also punishable by up to expulsion from The Citadel.
>
> 1.5.3 **Hazing is defined as a wrongful striking, an unauthorized laying hand upon, threatening with violence, or offering to do bodily harm by any student to another student, or any other unauthorized treatment by one student**

> **toward another student of a tyrannical, abusive, shameful, insulting, or humiliating nature; or otherwise requiring any student to perform any personal service for another student except as specifically provided for in Cadet Regulations.**

(*See* Docket Entry # 1-3, at p.9 ¶ 1.5 (emphasis in original)). The Blue Book provides that cadets may be expelled from The Citadel for violations of the Honor Code or for hazing. (*See* Docket Entry # 1-3, at p.48 ¶ 6.2.1.2). Moreover, all cadets are required to sign a "Requirement to Report Hazing, recognizing that every cadet has "a personal responsibility to report known instances of hazing." (*See* Docket Entry # 1-3, at 65).

### 2. <u>Disciplinary Procedure for Class I Offenses</u>

The Citadel's Blue Book "provides specific policy guidance for members of the South Carolina Corps of Cadets." (*See* Docket Entry # 1-3 ¶ 1.1). It defines Class I offenses at The Citadel as those punishable by expulsion, dismissal or suspension. (*See* Docket Entry # 1-3 ¶6.2.1.2). Under the Blue Book, for "Class I offenses the Commandant shall set the matter to be heard by a Board or Hearing."[1] (*See* Docket Entry # 1-3 ¶ 6.10.1.3). "Hearings are conducted in accordance with the procedures in Chapter 11, White Book." (*See id.* ¶ 6.10.3.5). Among other things, the White Book sets forth the following standards to govern hearings:

> The Hearing differs from the Informal Investigation in that it brings together at one time and location the individual responsible for deciding punishment or recommending punishment, the accused, witnesses, members of the chain of command, and any others who may be able to provide information helpful to the process. A hearing is held at the discretion of the Punishment Approval Authority or the Commandant or at the request of the accused. Once it is determined that a hearing is to be conducted, the accused is given at least 72 hours notice as to the date and time of the Hearing. The accused is authorized to have up to two (2) people assist him/her during the Hearing (exclusive of the special assistant to the President for legal affairs, the Ombudsman, the EEO Officer, and members of the Commandant's Department), have witnesses appear on his/her behalf, cross-examine witnesses, hear his/her accusers and present matters in extenuation and/or mitigation. When a cadet requests a Hearing or when the Commandant directs a Hearing, a record of Hearing Procedures (CC Form 103) is initiated. Instructions for preparation of CC Form 103 are at Appendix 1. This form serves as the record of the entire Hearing process to include the punishment

---

[1] This case involves the hearing procedure, not a Commandant's Board.

> decision/recommendation and appeal. The Hearing Officer uses the Hearing Guide at Appendix 2 to guide the conduct of the Hearing. The Hearing Officer is normally the Assistant Commandant for Discipline. The Commandant may appoint other officers to conduct Hearings as appropriate.

(*See* Ex. A ¶ 11.E.2.c). Chapter 11 of the White Book contains numerous other requirements and forms to ensure that the process is fair for the accused. (*See generally* Ex. A).

The Blue Book provides additional safeguards to cadets charged with the most serious offenses:

> Students accused of a violation of disciplinary regulations which may lead to suspension, dismissal, or expulsion are entitled to the following:
>
> > To have a fair and prompt hearing before an officer or a board of officers of the College;
> >
> > To be informed in writing of the offense (the Performance Report is notice of the charges) of which accused, and to have reasonable time to prepares defense (when feasible. Class I offenses will be heard by a board or hearing after receipt of the ERW. Extensions can be approved at the discretion of The Commandant.);
> >
> > In all college hearings and boards in which a student faces suspension, dismissal, or expulsion, the student may be represented by up to two student "representatives." Representatives must be students in the same academic program as the student facing disciplinary action, i.e., graduate students may not serve as representatives for cadets.
> >
> > To present information on their own behalf;
> >
> > To be able to submits petition of appeal to the proper authority should the decision go against them;
> >
> > To resign from the College at any time prior to a hearing or an appeal which they have requested.

(*See* Docket Entry # 1.3 ¶ 6.10.7.1). In other words, the policies of The Citadel are designed to provide those accused of offenses with serious consequences robust procedural and substantive protections.

Under The Citadel's regulations, the hearing officer is not the final decision-maker in cases where suspension, dismissal or expulsion is a possibility. Rather, the hearing officer makes a recommendation, and the President alone has the power to impose such penalties:

> The hearing officer's or board's determination shall be made on the basis of whether it is more likely than not that the accused student violated the disciplinary code. Based on the evidence presented, the hearing officer or board may recommend any appropriate penalty to the appointing authority. Disciplinary penalties involving suspension, dismissal, or expulsion may be recommended to the President by the appointing authority and shall be imposed only by the President. The President may impose punishment based on the information in the Board's report as well as the cadet's entire education record.

(*See* Ex. B ¶ VI.3.d).

The Blue Book further provides that an accused may appeal from the decision at a disciplinary hearing, but that such an appeal is not "a second forum in which to present the case." (*See* Docket Entry # 1-3 ¶ 6.10.6.2). Rather, grounds for an appeal are limited to: (a) whether the hearing officer "failed to follow due process"; and (b) whether "significant information has been discovered since the" hearing that would probably change the result, but could not have been previously discovered in the exercise of due diligence. (*See id.* ¶ 6.10.6.3).

**B. <u>Facts Relevant to the Instant Motion</u>**

Plaintiff avers that during the second semester of his sophomore year at The Citadel he served as a Squad Corporal, with responsibility for the individual training, personal appearance and cleanliness of a group of "knobs" (freshman cadets). (*See* Docket Entry # 1-1 ¶¶ 13-15). Plaintiff further claims that in February, 2016:

> one of the cadets in the squad for which I was responsible, a person with the initials D.M., independently filed a complaint with administrators at The Citadel, alleging that I and another cadet, a person with the initials A.M., had treated D.M. and other knobs unfairly in my and A.M.'s effort to ensure that D.M. and the other cadets met The Citadel's rules and regulations. D.M. alleged that A.M. and I (1) directed the knobs to vigorously shine (or "blitz") the brass parts of their uniforms ("brass"); (2) marked or scratched certain knobs' brass, then told the knobs to shine the brass; and (3) took metal letters ("company letters") given to knobs by the College.

(*See* Docket Entry # 1-1 ¶ 20).

On February 4, 2016, Plaintiff signed two Incident Report/Witness Accounts relating to the allegations against him. (*See* Ex. D-1). In those documents, Plaintiff admitted to both scratching the brass of underclassmen and taking the brass of underclassmen. (*See id.*). He

further stated that "I am aware that what I did was wrong & against the rules." (*See id.*). He continued that "I know I should not have scratched belt brass. My justif[ic]ations are not grounded." (*See id.*). Additionally, he admitted to instructing an underclassman to scratch a "cock & balls" on the brass of another underclassman. (*See id.*). Importantly, The Citadel makes clear in the Blue Book that "[w]hen a cadet makes an oral or written report or statement, regardless of circumstance, the report or statement is expected to be true." (*See* Docket Entry #1-3 ¶ 6.11.1). Indeed, the school's strict honor code compels cadets to be truthful in their responses.

To one not familiar with The Citadel's Fourth Class System, scratching an underclassman's brass might not seem very serious. In fact, it is one of the worst things, not involving physical abuse, that someone can do to a "knob". Among the many responsibilities that are heaped on knobs, they are required to maintain their brass in pristine, brightly shined condition at all times. They are subject to discipline if they fail to do so. This responsibility emphasizes the importance and the difficulty of maintaining attention to detail amidst overwhelming pressure. To scratch a knob's brass is to doom him to hours of polishing in order to restore the brass to its required level of shine. This deprives the knob of his most precious commodity, time. Scratching a knob's brass is a quintessentially tyrannical, abusive, and humiliating act by an upperclassman. (*See* Ex. D ¶ 24).

After an investigation and the taking of witness statements, on February 8, 2016, Lieutenant Colonel Jefferson Panton and Major Greg Speaker recommended a Commandant's Board for Plaintiff for a charge of hazing for: (a) scratching the brass of underclassmen; (b) taking the brass of underclassmen; and (c) taking all blitzed brass from underclassmen after the investigation began. (*See* Ex. D-2). In a February 9, 2016 Performance Report (PR), Plaintiff was formally accused of hazing and interfering or obstructing an investigation, in violation of The Citadel's rules, in the following particulars:

> As a result of an investigation, vandalizing knob brass, taking brass from knobs without reimbursement, stole company letters, he impeded an investigation by

> taking all blitzed brass from the knobs when he discovered an investigation was being conducted and gave it to Cadet [A.M.]. See attached documents

(*See* Ex. D-3).

Plaintiff's February 12, 2016 Explanation of Report, Written (attached hereto as Exhibit A) *admits* that he engaged in hazing in violation of The Citadel's policies. Specifically, with regard to the allegations of "[v]andalizing knob brass," Plaintiff admitted that he entered the room of Cadets S. and G, with the purpose of inspecting Cadet S.'s hat brass, which was to be shined each night. (*See* Ex. D-4). Cadet S. was *not* in the room, but Plaintiff observed his hat brass on the desk and perceived it not to be shined. (*See id.*). As a result, he intentionally physically damaged Cadet S.'s brass and directed Cadet G. to do so as well:

> I decided to scratch the blitzed brass that was displayed on his desk as a result. I asked if he [Cadet G.] wanted to scratch a "cock and balls" into the brass. He laughed and expressed an interest.
>
> Though [Cadet G.] scratched [Cadet S.'s] brass, he did so under my suggestion and supervision. [Cadet G.] is in no way responsible for what happened; my poor model of leadership is the only source of blame for this situation. [Cadet G.'s] laughter and willingness are not a cover for my negligence as a leader.

(*See id.*). He admitted that his actions were "rash and childish." (*See id.*).

Moreover, with respect to accusations that he had "tak[en] brass from knobs without reimbursement/stole company letters," Plaintiff admitted that, as a form of discipline, he would steal the hat brass of knobs under his leadership:

> Upon assuming the role of squad corporal I found that the 4C cadets in my squad wore blitzed letters in their covers. I encouraged them to continue to blitz on their own, and proposed that I take letters if they did not meet a standard. They agreed. At the time, I was under the impression that what I was doing was acceptable because the 4C agreed to the proposal and were not in danger of any physical harm. This was a naive perception. I now know that as a leader the 4C will agree to most anything I say based solely on the grounds that they want to make me happy. It is embarrassing that my model of leadership was focused around 4C cadets attempting to earn my admiration and respect by thinning a piece of brass.

(*See id.*). He further admitted that, rather than fostering performance of his squad, he was "promoting a toxic leadership environment." (*See id*). He noted that: "I am disappointed in myself that I demonstrated such shallow and ineffective methods of leadership to a group that

was looking to me for direction and lessons of leadership." (*See id.*). After being caught, he claimed that he intended to return the brass to the cadets. Plaintiff further admitted that his "actions were wholly unprofessional and unacceptable." (*See id.*).

To compound matters, in a February 24, 2016 Explanation of Report, Written, Plaintiff admits that he stole brass from cadets in an effort to undermine The Citadel's investigation:

> A number of the reports refer to my collecting of all blitzed brass from my knobs. *This is accurate*. I was aware that Oscar was at potential risk for an investigation. . . . [I]n hopes of protecting my knobs, individuals that willingly broke rules as per my requests, I demanded they turn in all contraband brass. I was not attempting to cover my tracks nor hide what I did. I was concerned that the knobs would have to claim responsibility for leadership errors that I made. I did not want them to feel as if they needed to protect me. I wanted them to be able to approach an investigation with honesty and candor.

(*See* Ex. D-5). He admits that such conduct was "a poor reflection on my sense of honor." (*See id*.).

On February 24, 2016, Plaintiff met with Susan Redmond, who briefed him on his rights. Mrs. Redmond provided Plaintiff with an original and supplemental witness list identifying those who might testify against him. (*See* Exs. D-8 and D-9). She also had Plaintiff complete a Cadet Rights Briefing form, which listed the various rights afforded to Plaintiff in this process. (*See* Ex. C). In this form, Plaintiff acknowledged the following, *inter alia*:

- He had been given copies of witness statements;
- That any statement he may make, in writing or otherwise, could be used against him;
- He could be represented by up to two cadets of his choosing;
- He could challenge the Hearing Officer;
- He had the right to introduce information and witnesses at the hearing; and
- He had the right to question witnesses testifying against him.

(*See id.*).

By Discipline General Order No. 89, Defendant Lieutenant Colonel Robert Sberna was appointed Hearing Officer for the hearing of the charges against Plaintiff and Cadet A.M., and Susan Redmond was appointed Recorder. (*See* Ex. D-7). A hearing was conducted on the allegations against Plaintiff and Cadet A.M. on March 10, 2016 "to determine if there was any additional information outside the Explanation of Reports, Written . . to substantiate the alleged offenses and if proven, assign the appropriate punishment." (*See* Ex. D-6, at ¶¶ 1 and 2). Plaintiff was represented at the hearing by another cadet. There is no evidence that Plaintiff was denied the opportunity to examine witnesses, present his own witnesses, testify on his own behalf or otherwise present his case.

The details of the hearing, including the evidence submitted and the findings made, are detailed in a March 11, 2016 Memorandum to the President of The Citadel. (*See* Ex. D-6). With regard to Plaintiff, the memorandum reflects:

> For the charge of "Hazing-interfering or obstructing a disciplinary investigation, vandalizing knob brass, taking brass from knobs without reimbursement, stole company letters (R's), impeded an investigation by taking all blitzed brass from the knobs when he discovered an investigation was being conduct and gave them to Cadet McGrath". -PROVEN

(*See id.*). The memorandum reflects a *recommendation* that Plaintiff be suspended, a lesser punishment than that ultimately given to Plaintiff. Under the College Regulations, however, only the President can suspend, dismiss, or expel a cadet. (*See* Ex. B ¶ VI.3.d). In accordance with that regulation, CAPT Eugene Paluso, USN (Ret.), Commandant of Cadets, reviewed the memorandum; he recommended that Plaintiff be dismissed. Lt. Gen. John W. Rosa, USAF (Ret.), President of The Citadel, then reviewed the memorandum, and concurred in CAPT Paluso's recommendation. Consequently, Special Order D-44 imposed the punishment of dismissal upon the Plaintiff. (*See* Ex. D-10).

Plaintiff then submitted a lengthy, well-written and researched appeal, in which he was represented by qualified counsel, attorney Tally Parham Casey. (*See* Ex. E). In his appeal, Plaintiff argued that the hearing process did not afford him due process and that new information

should be considered in his favor. (*See id.*). In Special Order D-44 (Change 1), President Rosa rejected Plaintiff's appeal and dismissed Plaintiff from The Citadel as follows:

> **For Hazing (Class 1, Code 200): Dismissal.**
>
> The period of Dismissal begins immediately upon completion of his last exam for the 2016 Spring Semester and includes the 2016 Maymester, Summer I and II sessions, Fall semester and 2017 Spring Semester.
>
> Cadet Imhoff may apply during the 2017 Spring semester for possible readmission for the 2017 Fall semester. If Cadet Imhoff wishes to apply for readmission into the South Carolina Corps of Cadets, he is required to interview with the Assistant Commandant for Discipline.
>
> As Cadet Imhoff's Appeal has been rejected, this punishment is FIRM.

(*See* Ex. D-11 hereto). This Special Order D-44, Change 1, is the punishment that Plaintiff challenges in this lawsuit.

For the reasons set forth herein, this Court should decline Plaintiff's invitation to second-guess The Citadel's disciplinary procedures and should deny Plaintiff's request for a preliminary injunction.

## ARGUMENTS

### A. Plaintiff Has Not Carried His Burden of Showing Entitlement to a Preliminary Injunction

"A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008). "[P]laintiff bears the burden of establishing that each of these factors supports granting the injunction." *Direx Israel, Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 812 (4th Cir. 1991) (internal quotation marks and alteration omitted); *accord Carter v. Citadel Board of Visitors,* 835 F. Supp.2d 100 (D.S.C. 2011) (applying these principles in denying preliminary relief to student dismissed from The Citadel for disciplinary reasons).

"[G]ranting a preliminary injunction requires that a district court, acting on an incomplete record, order a party to act, or refrain from acting, in a certain way. 'The danger of a mistake in this setting is substantial.'" *Hughes Network Sys., Inc. v. InterDigital Communications Corp.*, 17 F.3d 691, 693 (4th Cir. 1994) (internal alteration omitted) (*quoting American Hosp. Supply Corp. v. Hospital Prods. Ltd.*, 780 F.2d 589, 593 (7th Cir.1986)). "Federal decisions have uniformly characterized the grant of interim relief as an extraordinary remedy involving the exercise of a very far-reaching power, which is to be applied 'only in [the] limited circumstances' which clearly demand it." *See Direx Israel, Ltd.*, 952 F.2d at 811 (*quoting Instant Air Freight Co. v. C.F. Air Freight, Inc.,* 882 F.2d 787, 800 (3d Cir. 1989)).

For the reason that follow, this is not one of those rare cases in which injunctive relief is appropriate.

#### 1. Plaintiff Is Highly Unlikely to Succeed on the Merits

Plaintiff cannot carry his heavy burden of showing that he is likely to succeed upon the merits at trial. In fact, it is highly unlikely that Plaintiff will succeed at trial.

**a. Section Procedural/Substantive Due Process Claims (Counts I and II – All Defendants)**

In Count I of his Complaint, Plaintiff claims that The Citadel violated his substantive and procedural due process rights under the United States Constitution. In Count II, Plaintiff asserts a claim alleging that Defendants violated Article I, Section 3 of the South Carolina Constitution, which provides:

> The privileges and immunities of citizens of this State and of the United States under this Constitution shall not be abridged, nor shall any person be deprived of life, liberty, or property without due process of law, nor shall any person be denied the equal protection of the laws.

"'It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking a basis in wisdom or compassion,' or because of mistake." *Shaw v. Board of Trustees of Frederick Comm. College*, 549 F. 2d 929, 932 (4th Cir. 1976) (quoting *Wood v. Strickland*, 420 U.S. 308, 326, 95 S. Ct. 992, 43 L.Ed.2d 214 (1975)) (emphasis added). It is a well-established principle that, "[i]n the absence of constitutional or statutory deprivation, the courts are loathe to interfere with the organization and operation of an institution of higher education." *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 627 (4th Cir. 2003).

For the reasons that follow, Plaintiff cannot show a violation of his substantive or procedural due process rights.

**i. Substantive Due Process**

"[A] violation of an individual's substantive due process rights exists only when the official action is 'so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience.'" *Kerr v. Marshall Univ. Bd. of Governors*, 824 F.3d 62, 80 (4th Cir. 2016) (*quoting Hawkins v. Freeman*, 195 F.3d 732, 738 (4th Cir. 1999)). Such a violation will not exist in the absence of evidence of governmental conduct that is truly capricious:

> The touchstone of due process is "protection of the individual against arbitrary action of government." *Wolff v. McDonnell*, 418 U.S. 539, 558, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). "To establish a violation of substantive due process, a student must demonstrate arbitrary and capricious conduct on the part of

> university officials by showing that there was no rational basis for the university's decision or must show that the dismissal was motivated by bad faith or ill will unrelated to academic performance." [*Cobb v. Rector & Visitors of Univ. of Va.*, 69 F. Supp. 2d 815, 826 (W.D. Va. 1999) (citations omitted).] A plaintiff must demonstrate some "egregious official conduct" which constitutes "an abuse of power that shocks the conscience." *Dunn v. Fairfield Community High Sch. Dist. No. 225*, 158 F.3d 962, 965 (7th Cir. 1998).

*See Smith v. Virginia Milit. Inst.*, 2010 WL 2132240, at *4 n.10 (W.D. Va. May 27, 2010) (attached hereto as Ex. F).

Plaintiff is not likely to succeed upon this claim, as the evidence does not remotely support a finding that The Citadel acted in a manner that would "shock the conscience" in dismissing him. Plaintiff admitted in his statements and Explanations of Report, Written that he vandalized property that did not belong to him. (*See* Exs. D-1, D-4 and D-5). He admitted that he directed a knob to scratch a "cock and balls" on the brass of another knob. (*See* Ex. D-4). To compound matters, when it became apparent that Plaintiff's conduct might come to light, he took brass from cadets to thwart the investigation. (*See* Ex. D-5). Simply put, Plaintiff's own words provided more than sufficient evidence for The Citadel to dismiss him as a cadet.

Under The Citadel's governing Blue Book, "hazing" is defined as including "any . . . unauthorized treatment by one student toward another student of a tyrannical, abusive, shameful, insulting, or humiliating nature." (*See* Docket Entry # 1-3, at p.9 ¶ 1.5.3 (emphasis omitted)). In the context of The Citadel's Fourth Class System, Plaintiff's conduct was unquestionably tyrannical, abusive, and humiliating, as it served no purpose other than to consume hours of his subordinate's precious, limited time. While Plaintiff did not physically harm or contact underclassmen, he engaged in conduct that falls squarely within the Blue Book's definition of "hazing." In any event, Plaintiff cannot show that The Citadel acted in an arbitrary and capricious manner that would shock the conscience of the Court.

Therefore, this Court should deny Plaintiff's request for a preliminary injunction.

**ii. <u>Procedural Due Process</u>**

Plaintiff further argues that The Citadel violated his procedural due process rights. In

other words, he challenges the nature of the investigation and hearing process to which he was subjected.

> While university students "possess a 'constitutional protectable right' in their continued enrollment in a university," *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 627 (4th Cir. 2002), students' due process rights may be satisfied by "something less than a trial-like proceeding." *Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th Cir.1983) (*citing Goss v. Lopez*, 419 U.S. 565, 574, 95 S. Ct. 729, 42 L.Ed.2d 725 (1975)). The amount and type of process due is dependent on the nature of the interests at stake. *Goss*, 419 U.S. at 575–76, 95 S.Ct. 729.

*See Carter v. Citadel Bd. of Visitors*, 835 F. Supp. 2d 100, 103 (D.S.C. 2011) (denying preliminary injunctive relief).

Courts in this Circuit have noted that the amount of process required in this context is not the same as that applicable in a full trial:

> Where a student faces expulsion, . . . the Fourth Circuit has embraced the following due process standard:
>
> > The notice should contain a statement of the specific charges and grounds which, if proven, would justify expulsion under the regulations of the [University]. The nature of the hearing should vary depending upon the circumstances of the particular case. The case before us requires something more than an informal interview with an administrative authority of the college. By its nature, a charge of misconduct, as opposed to a failure to meet the scholastic standards of the college, depends upon a collection of the facts concerning the charged misconduct, easily colored by the point of view of the witnesses. In such circumstances, a hearing which gives the ... administrative authorities of the college an opportunity to hear both sides in considerable detail is best suited to protect the rights of all involved. This is not to imply that a full-dress judicial hearing, with the right to cross-examine witnesses, is required. Such a hearing, with the attending publicity and disturbance of college activities might be detrimental to the college's educational atmosphere and impracticable to carry out. Nevertheless, the rudiments of an adversary proceeding may be preserved without encroaching upon the interests of the college.
>
> *Cobb v. Rector & Visitors of Univ. of Va.*, 69 F.Supp.2d 815, 828–29 (W.D. Va. 1999). (alteration and omissions in original) (*quoting Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 159–59 (5th Cir.1961)); *see also Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69, 74 (4th Cir.1983).

*See Doe v. Alger*, ___ F. Supp. 3d ___, 2016 WL 1274025, at *12-*13 (W.D. Va. March 31,

2016) (attached hereto as Ex. G).

Plaintiff himself notes that procedural process will generally be satisfied if four protections are in place:

> The following safeguards should be provided in order to satisfy the requirements of due process: (1) the student must be notified before the hearing of the charges against him; (2) he is entitled to the names of the witnesses against him and either a summary of their testimony or the opportunity to confront and cross examine these witnesses; (3) he has the right to be heard in his own defense and to be present and present evidence on this own behalf; and (4) serious disciplinary action should be based upon ample evidence such that the decision is not arbitrary or capricious. *See Henson v. Honor Comm. of Univ. of Va.*, 719 F.2d 69 (4th Cir. 1983).

(*See* Docket Entry # 4-1, at 8).

First, it is undisputed that Plaintiff was advised of the charges against him before the hearing. Plaintiff was initially informed of the suspected disciplinary violations when Lt Col Jeff Panton, USA (Ret.) and Major Greg Speaker, USA (Ret.), the initial investigators, informed him that he was being investigated for hazing. He subsequently received witness statements from the cadets whose brass he damaged. Thereafter, but well before the hearing with Lt Col Sberna, he received a Performance Report which specifically accused him of hazing, and detailed the specific actions which constituted that disciplinary violation. (*See* Ex. D-3). Then, shortly before the hearing, he signed a signed a Cadet Rights Briefing stating the charges against him, the maximum possible punishment, the hearing officer and his procedural rights. (*See* Ex. C).

Second, Plaintiff was presented with Discipline General Order No. 93 and Discipline General Order No. 93, Change 1, which collectively identified the witnesses against him. (*See* Exs. D-8 and D-9). Moreover, there is no dispute that Plaintiff (or his representative) was permitted to confront or cross-examine those witnesses. Plaintiff complains about the demeanor of the Hearing Officer, presenting isolated examples where Plaintiff feels that the Hearing Officer cut off witnesses, encouraged witnesses to give false testimony, led witnesses or "demonstrated a complete disinterest in receiving the actual facts." (*See* Docket Entry # 4-1, at 11-12). However, he provides no specific evidence to support this claim, aside from his sheer

speculation.  He provides no affidavit from any witness who failed to give accurate testimony because of the conduct of the Hearing Officer.  More importantly, he provides nothing beyond the *ipse dixit* of his counsel to support his insulting accusation that the Hearing Officer had some sort of inclination against him.  In fact, when it turned out that a witness statement had not been provided to Plaintiff, the Hearing Officer asked if Plaintiff still wanted to continue with the proceedings; Plaintiff agreed that the matter should keep proceeding.  (*See* Ex. D-6 ¶ 8(e)).  And, of course, Plaintiff *admitted* all the essential elements of the offense in his response to the charge.  The Hearing Officer actually recommended a lesser punishment – suspension – than was ultimately imposed.

Third, Plaintiff was present at the hearing, had a representative and was permitted to present his case.  He could testify on his own behalf if he so desired.  He gave numerous written statements, which the Hearing Officer considered.  Additionally, he presented a lengthy appellate filing through counsel.  (*See* Ex. E).  Simply put, Plaintiff cannot reasonably suggest that he did not have the ability to have his "day in court."

Finally, as discussed above, the decision to dismiss Plaintiff was based upon ample evidence such that the decision is not arbitrary or capricious.  It was not the least punishment that he could have received, but it was not the most severe either. While Plaintiff may disagree with The Citadel's construction of the Blue Book, he cannot dispute that he admitted to the factual predicate of the charges against him.  He admitted that he scratched the brass of underclassmen, and specifically directed an underclassman to scratch a "cock and balls" onto the brass of his roommate.  (*See generally* Exs. D-1, D-4, D-5 and D-6).  He admitted to taking the brass of underclassmen and engaging in conduct that undermined the investigation.  While he claims, now that he has been caught, that he intended to return the brass, this does not change the fact that he admitted to the charges against him.

In light of the foregoing, Plaintiff has not shown that he is likely to succeed on the merits of his procedural due process claims.

### b. Breach of Contract (Count III – The Citadel)

The basis for Plaintiff's breach of contract claim is that the Blue Book creates a contract between The Citadel and himself, under which The Citadel was obligated to provide him "due process" and "a fair and prompt hearing before an officer or a board of officers of the College." (*See* Docket Entry # 1-3 ¶¶ 6.10.6.3 and 6.10.7.1). As discussed above, Plaintiff was afforded all of the procedural protections set forth in the Blue Book and White Book. He was apprised of the charges and witnesses against him, could appear at the hearing, could call and examine witnesses, and could present arguments. Plaintiff's breach of contract claims all fail for the same reasons his due process claims fail.

## 2. Plaintiff Has Not Shown That the Equities Tip in His Favor

Plaintiff has not carried his burden of showing that the balance of the equities tips in his favor. As set forth herein, Plaintiff has *admitted* to engaging in conduct that violated the policies and rules of The Citadel. He admits to conduct that created a "toxic" environment and that he acted in a manner that was "wholly unprofessional and unacceptable." (*See* Ex. D-4). In other words, he admitted to conduct that was in violation of The Citadel's demanding code of conduct. Knowing that he was about to be brought to justice for his actions, Plaintiff compounded his misconduct by taking cadets' brass in an effort to cover up what he had done. Plaintiff has not come to the Court with clean hands.

Moreover, even the manner in which Plaintiff has come to the Court is inequitable. Despite having more than a month and a half, he waited until the very last moment to file this lawsuit. He did not even give The Citadel a courtesy call to advise that the lawsuit was forthcoming and that a hearing might be necessary with very little notice. His counsel's first communication to The Citadel was at 3:30 pm on Friday, August 19, less than seventy-two hours before this temporary injunction hearing. Additionally, he named numerous individual Defendants in this lawsuit, including Captain John Ryan, Major Jon Craig and Captain Lewis Jackson. Those individuals, while present at Plaintiff's Hearing, had *nothing to do with* the decision against Plaintiff in that hearing or the imposition of punishment on Plaintiff. (*See* Ex. D

¶7). They had *nothing* to do with the alleged constitutional violations forming the basis of Plaintiff's Complaint. Plaintiff has wrongfully named these individuals as Defendants in this case, exposing them to disrepute and likely causing them to incur unnecessary expenses defending frivolous claims against them. Thus, Plaintiff's conduct in this short-lived litigation has not been equitable.

While Plaintiff complains about the result of his hearing and his punishment, he presents no evidence that anyone at The Citadel acted in bad faith or with an intention to harm him. He disagrees with The Citadel's ultimate conclusion, but does not present a scintilla of evidence to support that The Citadel's conduct was inequitable in any way. While he points out isolated incidents where he perceives that the Presiding Officer "cut off" witnesses, Plaintiff conveniently omits that he had, before the hearing even began, confessed to the charges against him. Moreover, he presents no evidence that the Presiding Officer's conduct was, in any way, inequitable or the product of malice. Far from being the "kangaroo court" of Plaintiff's imagination, the Hearing was an ordered, formal proceeding, in which Plaintiff was advised of his rights and the witnesses who might testify against him. Detailed findings were made against Plaintiff, *all of which were consistent with Plaintiff's own confessions*.

On balance, the Plaintiff cannot show that the equities are in his favor. If anything, Plaintiff's underlying conduct and dealings with The Citadel reflect that he has come to the Court with unclean hands.

For the foregoing reasons, this Court should deny Plaintiff's request for a preliminary injunction.

### 3. Plaintiff Has Not Shown That the Granting of Preliminary Injunctive Relief Is in the Public Interest

Finally, the granting of injunctive relief would not serve the public interest. There is obviously a strong public interest in preventing hazing. *See Kenner v. Kappa Alpha Psi Fraternity, Inc.*, 808 A.2d 178, 183 (Pa. Super. Ct. 2002) ("[T]here is a substantial public interest in assuring that individuals will not die or suffer substantial injury in an attempt to become

members of a fraternity."); *Poway Unified Sch. Dist. v. Superior Court (Copley Press)*, 62 Cal. App. 4th 1496, 1506, 73 Cal. Rptr. 2d 777, 783 (1998) (noting "a legitimate and important competing public interest in ending school hazing practices potentially endangering many children"). Taken to its extreme, hazing can cause death, physical injury or emotional harm to its victims. While Plaintiff's conduct here did not physically harm anyone, it does exhibit the type of control that is at the heart of more harmful forms of hazing. Public policy obviously supports prevention of tyrannical, abusive, and humiliating conduct on any college campus. But given the unique educational paradigm of The Citadel, there must be a very low tolerance for hazing of any form. Permitting Plaintiff's conduct to go unpunished would send the wrong message to other cadets and could encourage more abusive conduct.

Preserving the integrity and autonomy of The Citadel's disciplinary system itself promotes the public's interest in academic freedom. As stated at the outset, The Citadel's mission is "to educate and develop our students to become principled leaders in all walks of life by instilling the core values of The Citadel in a disciplined and intellectually challenging environment." The Citadel's Corps of Cadets is designed as a leadership laboratory, in which students are first required to obey and then allowed to command other students. Failures, small and large, are anticipated and are part of the learning process. The Citadel's disciplinary system is an integral part of this process. For it to be effective, it must not be burdened by hyper technical legal requirements, and its results should not be lightly subjected to judicial second-guessing. All cadets — including those who are themselves the subjects of disciplinary proceedings — must be allowed to see that the rules of conduct are taken seriously and that violations will be met with swift and sure consequences.

The public interest is best served by supporting The Citadel's strong efforts to eradicate hazing and by supporting the disciplinary system that is integral to its academic mission.

**B. <u>Plaintiff Is Not Entitled to Preliminary Injunctive Relief Because He Has Not Promptly Acted to Protect His Rights</u>**

As an additional ground for the denial of preliminary injunctive relief, The Citadel notes that Plaintiff has not acted with sufficient diligence to justify such relief. The Fourth Circuit has noted that delay may be a basis for the denial of an injunction:

> "Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction." *Citibank, N.A. v. Citytrust*, 756 F.2d 273, 276 (CA2 1985). *See also Majorica, S.A. v. R.H. Macy & Co.*, 762 F.2d 7, 8 (CA2 1985) ("Lack of diligence, standing alone, may ... preclude the granting of preliminary injunctive relief, because it goes primarily to the issue of irreparable harm ..."). The Associations' delay is thus quite relevant to balancing the parties' potential harms. "Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required." *Skehan v. Bd. of Trustees of Bloomsburg State College*, 353 F. Supp. 542, 543 (M.D. Pa. 1973). *See also Lydo Enterprises v. City of Las Vegas*, 745 F.2d 1211, 1213 (CA9 1984) (finding grant of preliminary injunction to be an abuse of discretion because, inter alia, the plaintiff waited four months after notification of adverse zoning decision before bringing suit); and *Brookhaven Housing Coalition v. Kunzig*, 341 F. Supp. 1026 (E.D.N.Y.1972) (noting plaintiffs' year long delay, district court refused to preliminarily enjoin occupation of a new federal office building allegedly constructed in violation of Executive Order No. 11512).

*See Quince Orchard Valley Citizens Ass'n, Inc. v. Hodel*, 872 F.2d 75, 80 (4th Cir. 1989). A plaintiff may not wait until the eleventh hour to seek an injunction:

> Galaton has been aware of the facts forming the basis of his claims for months, yet waited until the fifty-ninth minute of the eleventh hour to seek an extraordinary equitable remedy. [Citations omitted.]. Galaton's proposed preliminary injunction would disrupt Progress's scheduled shareholder meeting to vote on the merger agreement and thereby prejudice Progress and the public. Galaton could have avoided this disruption with a prompt challenge. [Citation omitted.]. Galaton's argument that he is likely to suffer irreparable harm is due to his own delay. [Citation omitted.]. Equity need not and will not provide a balm for Galaton's self-inflicted wound.

*See Galaton v. Johnson*, 2011 WL 9688271, at *2 (E.D.N.C. Aug. 17, 2011) (Ex. H).

Plaintiff appealed from his punishment on April 25, 2016. (*See* Docket Entry # 1 ¶ 58). On June 28, 2016, The Citadel sent Plaintiff Special Order No. D-44, Change 1, which rejected

his appeal and finalized his dismissal from The Citadel. (*See* Ex. D-11). However, Plaintiff did not commence this lawsuit until 51 days later. More importantly, Plaintiff commenced this lawsuit on Thursday August 18, 2016, just days before upperclassmen were to report back for The Citadel's academic year on Sunday August 21, 2016. Plaintiff did not notify The Citadel that it planned to file suit or had commenced this action. Plaintiff finally served most of the Defendants at approximately 5:00 p.m. on Friday August 19, 2016, and those Defendants cooperated fully with service. Plaintiff can offer no justification for his unreasonable election not to seek relief prior to the fifty-ninth minute of the eleventh hour. The need for injunctive relief under these unfair circumstances is solely the product of Plaintiff's conduct.

The urgency of Plaintiff's request for injunctive relief is of his own making. Despite having more than a month and half to seek injunctive relief, Plaintiff chose to wait until the very last instant to file this lawsuit. If, as Plaintiff claims, he would be irreparably harmed by being dismissed from The Citadel, he certainly did not act with reasonable promptitude to enforce his rights. Instead, he sprung this action on The Citadel at the last possible moment. In an action in which Plaintiff complains about a perceived lack of due process, he ironically seeks relief from the Court without providing The Citadel with sufficient advance notice. The Court should not permit Plaintiff to engage in litigation by ambush and most definitely should not reward him with preliminary injunctive relief.

For the foregoing reasons, the Court should deny Plaintiff's request for a preliminary injunction.

## **CONCLUSION**

Therefore, for the foregoing reasons, this Court should deny Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction.

BARNWELL WHALEY PATTERSON & HELMS, LLC

BY: /s M. Dawes Cooke, Jr.

M. Dawes Cooke, Jr., Esq.
John William Fletcher, Esq.
885 Island Park Drive (29492)
P. O. Drawer H
Charleston, SC 29402-0197
(843) 577-7700
*Attorneys for Defendants The Citadel, The Military College of South Carolina, Lieutenant General John W. Rosa and Lieutenant Colonel Robert Sberna*

Charleston, South Carolina
August 21, 2016