W Y C H E

Attorneys at Law

RECEIVED
APR 25 2016
Office of the President

April 25, 2016

Lt. Gen. John W. Rosa
Office of the President
The Citadel, The Military College of South Carolina
171 Moultrie Street
Charleston, SC 29409

Re: Appeal of Decision to Dismiss Cadet Robert Hudson Imhoff IV (2B, R Company)

Dear Lieutenant General Rosa:

My name is Tally Parham Casey. Cadet Robert Hudson Imhoff IV ("Hudson") (2B, R Company) and his family have asked that I assist Hudson in connection with The Citadel, The Military College of South Carolina's ("The Citadel" or "The College") recent decision to dismiss Hudson from The College in connection with a March 10, 2016 Class I Student Conduct Hearing (number 22) involving Hudson.

Pursuant to The Citadel Memorandum 2-018, and on behalf of Hudson, please accept this letter and the enclosed memorandum, appealing The Citadel's decision to dismiss Hudson. Should you have any questions about this letter or the memorandum, please feel free to contact me at (803) 254-6542 or tcasey@wyche.com.

Sincerely,

Tally Casey

Lt. Col. (AFRES) Tally Parham Casey
tcasey@wyche.com

**MEMORANDUM IN SUPPORT OF THE APPEAL OF THE DECISION TO DISMISS CADET ROBERT HUDSON IMHOFF IV**

## INTRODUCTION

Since Cadet Robert Hudson Imhoff IV ("Cadet Imhoff"), 2B, R Company, was a very young child, he has wanted to serve in the military. Cadet Imhoff's grandfather, with whom Cadet Imhoff lived during much of his childhood, had a long career in the United States Army Air Corps., honorably serving the United States in World War II.

For financial reasons, Cadet Imhoff was unable to attend a military college immediately after graduating from high school in Maryland. As a result he attended a local college, Towson University, to and from which he commuted nearly every day to save money. While at Towson University, Cadet Imhoff distinguished himself both academically and as a member of the college's Reserve Officers' Training Corps program. Ultimately, as a result of his hard work and persistence, Cadet Imhoff obtained a scholarship from the United States Army Cadet Command, which enabled him attend The Citadel, beginning in the fall of 2014.

At The Citadel, Cadet Imhoff has excelled. Majoring in Mechanical Engineering, Cadet Imhoff has maintained a 3.95 grade point average. Cadet Imhoff served as Company Clerk during the first semester of his sophomore year in the Corps of Cadets. During this, the second semester of his sophomore year, Cadet Imhoff has served as Squad Corporal. Further, in the spring of 2016, Cadet Imhoff was advised that he was one of less than a dozen cadets at The Citadel admitted to United States Army Air Assault School.

On or about February 2016, however, Cadet Imhoff and one of his fellow cadets, Cadet [redacted] ("Cadet [redacted] were charged with engaging in misconduct for allegedly (1) directing or allowing certain knobs under their supervision to blitz brass, (2) taking brass and/or company letters from certain knobs under their supervision when the knobs failed to meet certain rules or expectations, and (3) taking blitz brass from knobs after The College started an investigation into possible cadet misconduct. While Cadet Imhoff and Cadet [redacted] allegedly engaged in substantively identical conduct, Cadet Imhoff was charged with Hazing and Cadet [redacted] was charged with a Major Violation of 4th Class System, a markedly less severe offense.

On March 10, 2016, the Commandant's Board held a joint student conduct hearing for Cadet Imhoff and Cadet [redacted][1] Lieutenant Colonel Robert A. Sberna, the Assistant Commandant for Discipline, presided over the hearing. In connection with the hearing, Lieutenant Colonel Sberna and the other hearing members made the following findings with regard to Cadet Imhoff:

[1] The Commandant's Board's memorandum relating to the hearing, which includes notes on the hearing and the findings of the Board, is attached hereto as Exhibit A. The transcript or the audio recording of the hearing is attached hereto as Exhibit B.

6. **Findings:** **Cadet Imhoff** –For the charge of "Hazing-Interfering or obstructing a disciplinary investigation, vandalizing knob brass, taking brass from knobs without reimbursement, stole company letters (R's), impeded an investigation by taking all blitzed brass from the knobs when he discovered an investigation was being conduct and gave them to Cadet [redacted]. -**PROVEN**

[2] The hearing members made nearly identical findings with regard to Cadet [redacted]

Upon the recommendation of Lieutenant Colonel Sberna and the other hearing members, on April 11, 2016, Cadet Imhoff was dismissed from The College by the Office of the Commandant, with the period of Cadet Imhoff's dismissal beginning immediately and including the remainder of the 2016 Spring semester, Maymester and Summer semesters, and the entirety of the 2016 Fall semester.[3] Upon information and belief, Cadet [redacted] received a far lesser punishment. Cadet Imhoff now appeals the decision of the hearing members and, by extension, the Office of the Commandant.

## BASES FOR APPEAL

Under The Citadel Memorandum Number 2-018, relief from a disciplinary decision may be granted on the grounds that (1) the affected student did not receive adequate due process or (2) significant new information has been discovered since the student's disciplinary proceeding.

The findings and punishment imposed upon Cadet Imhoff in this case should be modified on both of these grounds. The charge against Cadet Imhoff should be dismissed or reclassified to an offense less than Hazing. If any punishment is imposed, the punishment should be less than dismissal.

## DISCUSSION

### I. The Requirements of Due Process Were Not Met.

Both under South Carolina law and The Citadel's policies, a student involved in a disciplinary proceeding must be given due process.[4] As discussed, The Citadel Memorandum Number 2-018 expressly states that failure to provide a student adequate due process is ground for an appeal. Further, The Citadel Blue Book Regulation 6.10.2.4 provides that a student charged with an offense that could result in expulsion, dismissal or suspension is entitled to fair disciplinary hearing.

---

[2] Ex. A (Memorandum, Results of Class I Hearing #22) at unnumbered page 3.

[3] Id. at unnumbered page 1.

[4] See e.g., Goss v. Lopez, 419 U.S. 565, 574-75 (U.S. 1975).

Cadet Imhoff plainly did not receive adequate due process in connection with his Commandant's Board hearing and dismissal from The Citadel for Hazing because: (1) the conclusion of the Commandant's Board that Cadet Imhoff committed the offense of Hazing, as that term is defined by The Citadel's policies, is not supported by the facts of the case and witness testimony; (2) Cadet Imhoff did not have sufficient notice that his alleged conduct, while perhaps unprofessional, could even possibly be considered by The Citadel to constitute Hazing; and (3) the Commandant's Board's hearing was replete with examples of partiality and strong implications of bias, which effected the conduct of the hearing and its outcomes.

## A. The Hearing Members' Conclusion that Cadet Imhoff Committed "Hazing" is not Supported.

As set forth in Section VI(3)(d) of The Citadel's Regulations, "the hearing officer's or board's determination shall be made on the basis of whether it is more likely than not that the accused student violated the disciplinary code. Based on the evidence presented, the hearing officer or board may recommend any appropriate penalty to the appointing authority." (Emphasis added).

Moreover, under the law, due process requires that the procedures by which a public college's rules are applied must be fair, such that the college's students are not subjected to arbitrary punishment for alleged misconduct. Any finding or conclusion upon which disciplinary action against a student is taken must be based on substantial evidence heard or received by the college's disciplinary body.[5] "[I]f the word 'substantial' [is to mean] anything at all, it clearly implies that such evidence must be of ponderable legal significance. Obviously the word cannot be deemed synonymous with 'any' evidence. It must be reasonable . . . , credible, and of solid value . . . ."[6]

In the present case, the requirements of The Citadel's regulations and due process clearly were not met because the Commandant's Board was not presented with sufficient reliable evidence from which it could have reasonably concluded that Cadet Imhoff committed Hazing, as that offense is defined by The Citadel policies.

Section 1.5.3 of The Citadel's Bluebook defines Hazing, the only offense for which Cadet Imhoff was charged, as:

> [A] wrongful striking, an unauthorized laying hand upon, threatening with violence, or offering to do bodily harm by any student to another student, or any other unauthorized treatment by one student toward another student of a tyrannical, abusive, shameful, insulting, or humiliating nature; or otherwise requiring any student to perform any personal service for another student except as specifically provided for in Cadet Regulations.

---

[5] See Perlman v. Shasta Joint Jr. College Dist. Bd. of Trustees, 9 Cal.App.3d 873, 882 (1970).

[6] See Kuhn v. Department of General Services, 22 Cal. App. 4th 1627, 1633 (Cal. App. 3d Dist. 1994).

In Cadet Imhoff's case, however, there was no reliable evidence presented to the Commandant's Board that Cadet Imhoff committed even a single act that could arguably fall within the scope of the Hazing offense.

First, it is beyond dispute that, at most, Cadet Imhoff (1) directed or allowed knobs to blitz brass, (2) scratched brass, and (3) took company letters and brass from knobs. [7] That is to say, he did not wrongfully touch, strike or do bodily harm to any student, or require any student to perform any personal service for him.[8]

Similarly, the record is clear that Cadet Imhoff did not treat any other student in an unduly oppressive or tyrannical manner. It is uncontradicted that any knob from which Cadet Imhoff may have taken brass or letters "agreed to having their letters taken if someone in the squad was deficient. They never expressed disagreement or dislike for all matters involving blitzed letters. . . ."[9]

One student, Cadet [redacted] did allege that Cadet Imhoff had a "personal vendetta" against him, as supposedly evidenced by Cadet Imhoff allegedly once telling Cadet [redacted] that his second semester as a freshman was going to be harder and that he would make sure that he did not get a 4.0 grade point average. However, even assuming for argument's sake that this allegation is true (which it is not), (1) that same student, Cadet [redacted] also testified that Cadet Imhoff offered him academic advice[10]; (2) several other students testified that Cadet Imhoff worked hard to ensure that the students under his supervision, such as Cadet [redacted] obtained the best grades they possibly could[11]; (3) Cadet [redacted] never alleged that Cadet Imhoff actually undertook any act aimed at harming him physically or emotionally[12]; and (4) almost by definition, one single act involving merely words cannot constitute "tyrann[y]."[13] Cadet Imhoff simply did not "Haz[e]," as that term is defined by The Citadel's policies, Cadet [redacted] or any other student.

---

[7] See Exs. A & B.

[8] At the Commandant's Board hearing, there was some testimony regarding a possible allegation that Cadet Imhoff directed knobs to hold pushups in the plank position and to look into the sun and keep a bottle of hot sauce. Id. No witness, however, testified that he observed Imhoff make any such directions. Additional witness statements in further support of this undisputed fact are attached hereto as Exhibit C. Moreover, there was no testimony at the hearing that anyone observed any student improperly hold their pushups in the plank position, look into the sun, or drink hot sauce. Further, the Commandant's Board did not make any findings relating to any such possible allegations.

[9] Ex D (Imhoff Feb. 4, 2016 Incident Report / Witness Account).

[10] Ex. B at 65-66.

[11] See e.g., id at 99-100, 132; see also Ex. C.

[12] Ex. B, passim.

[13] Ex. B at 70 (Cadet [redacted] testifying that Cadet Imhoff did not do anything he found objectionable other than allowing or requiring him to blitz brass, making him perform pushups, and making a comment to him about receiving a 4.0 grade point average).

Pursuant to both the facts and The Citadel's policies, the Commandant's Board's finding that Cadet Imhoff interfered with or obstructed The College's investigation into possible cadet misconduct does not change this conclusion. The Commandant's Board was not presented with sufficient evidence from which it could have reasonably found that Cadet Imhoff interfered with or obstructed any investigation by The College. Notably, the Commandant's Board received absolutely no evidence which could have established: (1) when Cadet Imhoff allegedly took brass from students with the purpose of interfering with any investigation, (2) when The College's investigation at issue began; (3) any awareness (as of the time Cadet Imhoff allegedly took brass from students) by Cadet Imhoff of any investigation; and (4) that Cadet Imhoff, in fact, took brass from students during an investigation by The College.[14]

Even assuming for argument's sake that Cadet Imhoff was in fact aware of an investigation by The Citadel when he allegedly took brass from knobs (which he was not), Cadet Imhoff did not commit Hazing because such conduct plainly does not constitute unauthorized treatment of, or physical contact, with a student, let alone tyrannical behavior against a student.[15] Just as the Commandant's Board concluded that Cadet [redacted] did not commit Hazing, as that offense is defined by The Citadel's policies, the Commandant's Board should have similarly concluded that Cadet Imhoff did not commit Hazing. The Commandant's Board's conclusion to the contrary was not supported by substantial evidence, and thus Cadet Imhoff did not receive adequate due process under The Citadel's policies and the law.

### B. <u>Cadet Imhoff Did Not Have Sufficient Notice That His Alleged Conduct Constituted Hazing.</u>

Where an average person or student has not had reasonable notice that a given course of conduct violates a particular disciplinary rule, it violates the notion of fundamental fairness and due process for a student to be punished for violating the rule.[16] Further, a vague rule does not comply with the requirements of due process merely because there is some conduct that is clearly prohibited by the rule.[17]

Here, Cadet Imhoff did not have reasonable notice that his alleged misconduct constituted Hazing. First, as discussed above, Cadet Imhoff's alleged misconduct (or even the

---

[14] Ex. B, passim.

[15] This conclusion is further supported by the fact that, prior to the hearing of the Commandant's Board, Lieutenant Colonel Sberna expressly advised Cadet Imhoff that a finding that he interfered with a student conduct investigation by The Citadel could not be used in support of a Hazing charge and dismissal from The College.

[16] See Johnson v. United States, 135 S. Ct. 2551, 2560-2561 (U.S. 2015) ("For instance, we have deemed a law prohibiting grocers from charging an 'unjust or unreasonable rate' void for vagueness — even though charging someone a thousand dollars for a pound of sugar would surely be unjust and unreasonable.").

[17] Id.

actual findings of the Commandant's Board) do not fall within the scope of The Citadel's Hazing offense.

Second, under The Citadel regulations, Cadet Imhoff's supervision of knobs was monitored by his Squad Sargent, a junior student senior in rank to Cadet Imhoff. Neither Cadet Imhoff's Squad Sargent nor any other student (in a leadership position or otherwise) advised nor even remotely suggested to Cadet Imhoff that conduct of the type alleged in this case could constitute Hazing.

Third, when Cadet Imhoff was a freshman, less than a year ago, conduct identical to the alleged conduct at issue in this case was commonplace.[18]

Fourth, when (during Cadet Imhoff's freshman year) The Citadel became concerned about student conduct that was in fact tyrannical and abusive, and Cadet Imhoff was a student deemed to The Citadel to have been Hazed, The Citadel did not explain or suggest that conduct of the type alleged in this case could be deemed Hazing by The College.

Fifth, neither Cadet Imhoff, nor any of the persons connected with The Citadel with whom he has spoken in confidence about this matter, are aware of any other similar cases in which students have been charged or found guilty of Hazing. In fact, none of these persons had ever even contemplated that such alleged misconduct could constitute Hazing.[19] Accordingly, the requirements of due process were not met in this case because Cadet Imhoff did not have any notice that the alleged misconduct could possibly constitute Hazing.[20]

### C. <u>The Commandant's Board's Hearing was Replete with Showings of Partiality and Strong Implications of Bias.</u>

Due process also requires that decision makers on disciplinary bodies must be impartial and unbiased.[21] Further, regardless of whether or not such decision makers are in fact impartial and unbiased, due process requires that disciplinary proceedings be free from showings of partiality or strong implications of bias.[22]

---

[18] To this day, there are groups at The Citadel, such as the Summall Guards and the Junior Sword Arts, which blitz brass as a part of their organizational charters.

[19] This is understandable given the fact that, among other things, The Citadel's Blue Book is completely silent on the topic of blitzing brass as a form of misconduct.

[20] Cadet Imhoff has an exceptional academic, leadership and student conduct record. This record evidences that had Cadet Imhoff been given notice that the alleged misconduct constituted hazing, to the extent necessary, he would have conformed his behavior to meet the expectations of the College, just as he has done since this matter arose.

[21] <u>See</u> <u>Gibson v. Berryhill</u>, 411 U.S. 564 (1973).

[22] <u>Id.</u>

In the present case, the hearing of the Commandant's Board was replete with showings of partiality and strong implications of bias against Cadet Imhoff. As reflected in excerpts of a transcript of the audio recording of the Commandant's Board's hearing, these showings include Lieutenant Colonel Sberna: (1) cutting off witness' statements that would have otherwise established that Cadet Imhoff did not commit several of the acts alleged against him; (2) not allowing witnesses to fully answer Imhoff's or his student representative's (Cadet Second Lieutenant Phillip [redacted] questions; (3) overtly encouraging witnesses to provide testimony not supported by the actual facts, but rather his apparent pre-determined belief that Cadet Imhoff had engaged in certain misconduct or had a certain mental state when acting; and (4) leading witnesses and interjecting unsupported statements not otherwise before the Commandant's Board. For example:

> CADET [redacted] Imhoff and [redacted] always made sure that we had an [redacted] in the cover, a blitzed [redacted].
> MS. REDMOND: Imhoff and who? [redacted]?
> COLONEL SBERNA: [redacted], yeah.
> MS. REDMOND: Okay.
> COLONEL SBERNA: All right. Excellent.
> . . . .
> COLONEL SBERNA: All right. Okay. I'm worried about Imhoff only. So Imhoff never took any, but ---
> CADET [redacted] No.
> COLONEL SBERNA: But Imhoff directed you to have these blitzed [redacted]s.[23]

---

> CADET 2LT [redacted] So all he said to you was that there was no food and that it was over?
> COLONEL SBERNA [not allowing an answer to Cadet [redacted] question before suggesting to the witnesses, through a leading question, the answer he wanted to hear]: He told you not to go to the reception?
> CADET [redacted] He said -- he said, "Turn around. You're coming back with us."[24]

---

> COLONEL SBERNA: Do you know there's no requirement to learn the cadet prayer?
> CADET [redacted] No, sir.
> COLONEL SBERNA: That's optional. He can't tell you to learn the cadet prayer, he can't order you to learn the cadet prayer, and he can't discipline you if you don't know it.
> . . . .

[23] Ex. B at 45-46.

[24] Id. at 69-70.

CADET IMHOFF: Had your squad mates learned any of the cadet prayer prior to me coming in as squad corporal?
CADET 2LT [redacted] Stand by.
CADET IMHOFF: Yes, sir.
COLONEL SBERNA: Is that relevant to the fact that they're not required to and that -- how is that relevant?
CADET IMHOFF: If they showed an interest in learning it, sir.
COLONEL SBERNA: Okay. They can show an interest. Does that mean he has to?
CADET IMHOFF: No, sir, but ---
. . . .
CADET 2LT [redacted] Yes, sir. But it would be fair to assume if the whole squad knew it.
COLONEL SBERNA: I don't think so ---
CADET 2LT [redacted] Yes, sir.
COLONEL SBERNA: --- at all. As a matter of fact, that's an issue.
CADET 2LT [redacted] Yes, sir.
. . . .
COLONEL SBERNA: Okay? So -- and even if they all knew it, it comes back to you're not allowed to make them. So what?
CADET 2LT [redacted] Yes, sir.
COLONEL SBERNA: Do you see what I'm getting at?
CADET 2LT [redacted] Absolutely.
COLONEL SBERNA: Okay. But ask him the question and let him answer it. Let's see what he has to say.
CADET IMHOFF: Sure.
COLONEL SBERNA: If you want to still.
CADET IMHOFF: I mean, it doesn't seem relevant now.[25]

---

CADET 2LT [redacted] He did not explicitly say he was going to be personally responsible for you not making a 4.0?
COLONEL SBERNA [cutting off witness before he could answer a material question, the answer to which would have likely revealed the truth and favored Cadet Imhoff]: Let's go ask the obvious question.
CADET 2LT [redacted] Yes, sir.
COLONEL SBERNA: How did you interpret that?
CADET [redacted] I -- I interpreted, I mean, like I wrote in there, "personal vendetta" just like out for me.
COLONEL SBERNA: Okay.[26]

---

[25] Id. at 73-75.

[26] Id. at 77-78.

COLONEL SBERNA: Okay. Why [did Hudson take brass]?
CADET [redacted] I thought it was to protect us so that we wouldn't get in trouble for having it.
[Rather than asking questions and eliciting facts, Lieutenant Colonel Sberna follows by criticizing the witness's statement in favor of Imhoff].

These actions undoubtedly were not intended to deprive Cadet Imhoff of a fair disciplinary proceeding. Nevertheless, they show partiality and strong implications of bias at the Commandant's Board hearing, and thus Cadet Imhoff did not receive adequate due process.

## III. <u>There is Significant New Information that Should be Considered.</u>

Significant new information relating to the informal consequences of this matter to Cadet Imhoff has become available since the Commandant's Board hearing. Had this information been presented at the hearing, or otherwise available at the time of the hearing, Cadet Imhoff would not have been found guilty of Hazing and he would not have been dismissed from The Citadel.

The sanctions that result from a disciplinary proceeding must be proportional to the conduct of the wrongdoer.[27] Here, a myriad of extremely severe informal consequences of Cadet Imhoff merely being charged with Hazing have arisen since the hearing of the Commandant's Board. These consequences include:

- Cadet Imhoff losing admission to Army Air Assault School;
- Cadet Imhoff not being able to attend the Cadet Leadership Course this year, which will delay his professional advancement for at least one year;
- The prospect that Cadet Imhoff will lose his scholarship (valued at approximately $200,000) and Army contract, which could result in Cadet Imhoff having to pay the Army up to approximately $80,000; and
- Cadet Imhoff having a large and permanent barrier to achieving his childhood dream of having a long and fulfilling career in the military, as many persons in the military consider Hazing (regardless how that term is in fact defined) to be tantamount to a dishonorable discharge.

Cadet Imhoff will suffer from and have to deal with these consequences regardless of the ultimate resolution of this appeal and the final determination his culpability. When these consequences are considered in light of Cadet Imhoff's alleged misconduct, which does not even remotely involve any acts of tyranny or physical harm, the dismissal sanction imposed upon Cadet Imhoff plainly is not proportional to his conduct. Thus, the charge of Hazing against Cadet Imhoff, as well as his resulting dismissal, should be withdrawn or reduced.

---

[27] <u>See</u> <u>Atkins v. Virginia</u>, 122 S. Ct. 2242, 2247 (2002) (The Eighth Amendment prohibits "excessive" sanctions.).

## CONCLUSION

Cadet Imhoff did not receive adequate due process in connection with The Citadel charging and finding him guilty of Hazing, and then dismissing him from The College. The conclusion of the Commandant's Board that Cadet Imhoff committed the offense of Hazing, as that term is defined by The Citadel's policies, is not supported by the facts of the case and witness testimony. Further, Cadet Imhoff did not have sufficient notice that his alleged conduct could even possibly be considered by The Citadel to constitute Hazing and the Commandant's Board's hearing was replete with examples of partiality and strong implications of bias. Moreover, new evidence plainly reveals that the sanctions imposed upon Cadet Imhoff for his alleged misconduct are grossly disproportionate any actions by him. For the foregoing reasons, Cadet Imhoff respectfully requests that the charge of Hazing against him, as well as resultant sanction of dismissal, be withdrawn or reduced.

Respectfully submitted by:

Tally Casey

Lt. Col. (AFRES) Tally Parham Casey | Wyche
801 Gervais St, Suite B | Columbia, SC 29201
Phone: (803) 254-6542 | Fax: (803) 254-6544
tcasey@wyche.com | www.wyche.com/tparham

On behalf of:

/s/ Robert Hudson Imhoff IV

Cadet Robert Hudson Imhoff IV [redacted])